**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ALISON GRAEFF,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES ELECTION ASSISTANCE COMMISSION, et al.,<br><br>*Defendants*. | Civil Action No. 4:22-cv-00682 (RLW) |

**FEDERAL DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Statutory and Regulatory Background ..... 2

A. The Help America Vote Act of 2002 ..... 2

B. The EAC Testing and Certification Program ..... 3

1. The VSTL Program Manual: Certification of Testing Laboratories ..... 4

2. The VSTC Program Manual: Testing and Certification of Voting Systems to the VVSG ..... 5

3. Cooperative Federalism Principles in Use of EAC Certifications by States and Localities ..... 6

C. Missouri's State Law Requirements for the Certification of Voting Systems ..... 7

II. Procedural Background ..... 7

LEGAL STANDARD ..... 8

I. Motion to Dismiss ..... 8

II. Preliminary Injunction ..... 9

ARGUMENT ..... 9

I. Plaintiff Cannot Establish Article III Standing Against the Federal Defendants ..... 9

A. Plaintiff Has Not Alleged Any Cognizable Injury-in-Fact ..... 10

B. Plaintiff's Asserted Injury Is Also Not "Fairly Traceable" to the Federal Defendants, or Capable of Being Remedied Through Them ..... 14

II. Plaintiffs' Claims with Respect to the August 2, 2022 Primary Are Moot ..... 17

A. The Requested Relief Is Moot Because the Primary Has Already Occurred ..... 17

B. No Exception to the Mootness Doctrine Applies In this Case ..... 18

C. Plaintiff's Claims Became Moot Due to Her Own Delay ..... 19

III. This Court Otherwise Lacks Subject Matter Jurisdiction to Entertain Plaintiffs' Purported Claims Against the Federal Defendants ..... 21

A. No Individual Capacity Claims Against Federal Officials Have Been or May Be Asserted Here ..... 21

B. Plaintiff Has Not Identified Any Waiver of Sovereign Immunity Applicable to the Federal Defendants ..... 22

1. 28 U.S.C. § 1343 and 42 U.S.C. §§ 1983, 1985 ..... 23

2. Federal-Officer Constitutional Tort Claims ..... 24

3. The Declaratory Judgment Act ..... 25

4. Alleged Deprivation of State Constitutional Rights ..... 26

IV. Plaintiff's Motion for Preliminary Injunction Should Be Denied ..... 27

A. Plaintiff Has Not Shown a Probability of Success on the Merits of Her Claims ..... 27

B. Plaintiff Will Not Be Irreparably Harmed in the Absence of a Preliminary Injunction ..... 28

C. The Balance of the Equities and the Public Interest Do Not Support a Preliminary Injunction ..... 30

CONCLUSION ..... 30

# TABLE OF AUTHORITIES

## Cases

*Abdurrahman v. Dayton*,
903 F.3d 813 (8th Cir. 2018) .................... 18

*Abou-Hussein v. Gates*,
657 F. Supp. 2d 77 (D.D.C. 2009).................... 24

*Ajamu v. USPS*
No. 6:13-CV-450-ORL-28KRS, 2014 WL 169830 (M.D. Fla. Jan. 10, 2014) .................... 24

*Ali v. Cangemi*,
419 F.3d 722 (8th Cir. 2005) .................... 17

*Allen v. Wright*,
468 U.S. 737 (1984) .................... 15

*B.A. v. Missouri*,
No. 2:16-cv-72, 2017 WL 106433 (E.D. Mo. Jan. 11, 2017) .................... 9

*Beale v. Blount*,
461 F.2d 1133 (5th Cir. 1972) .................... 23

*Becker v. Fed. Election Comm'n*,
230 F.3d 381 (1st Cir. 2000) .................... 12

*Bell v. Schafer*,
No. 4:08-CV-1030 ERW, 2009 WL 2182170 (E.D. Mo. July 22, 2009).................... 23

*Benisek v. Lamone*,
138 S. Ct. 1942 (2018) .................... 30

*Berry v. Ashcroft*,
No. 4:22-cv-00465, 2022 WL 2643504 (E.D. Mo. July 8, 2022).................... 20

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
403 U.S. 388 (1971) .................... 24

*Bognet v. Sec'y of Commonwealth of Pa.*,
980 F.3d 336 (3d Cir. 2020), *vacated as moot*, 141 S. Ct. 2508 (2021) .................... 12

*Bowyer v. Ducey*,
506 F. Supp. 3d 699 (D. Ariz. 2020) .................... 12

*Brian v. Gugin*,
853 F. Supp. 358 (D. Idaho 1994).................... 24

*Brown v. Smith*,
828 F.2d 1493 (10th Cir. 1987) .......... 24

*Buckler v. United States*,
919 F.3d 1038 (8th Cir. 2019) .......... 9

*Buford v. Runyon*,
160 F.3d 1199 (8th Cir. 1998) .......... 25

*Byrd v. Smith*,
693 F. Supp. 1199 (D.D.C. 1986) .......... 24

*Calzone v. Hawley*,
866 F.3d 866 (8th Cir. 2017) .......... 15, 16

*Carney v. Adams*,
141 S. Ct. 493 (2020) .......... 10

*Carson v. Simon*,
978 F.3d 1051 (8th Cir. 2020) .......... 13, 14

*Cmty. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd.*,
150 F. App'x 389 (6th Cir. 2005) .......... 22

*Cooper v. Feeney*,
No. 2:22 CV 18 MTS, 2022 WL 2802303 (E.D. Mo. July 18, 2022) .......... 25

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) .......... 25

*Crist v. Comm'n on Presidential Debates*,
262 F.3d 193 (2d Cir. 2001) .......... 12

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 15

*Dakota, Minn. & E. R.R. Corp. v. Schieffer*,
711 F.3d 878 (8th Cir. 2013) .......... 25

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981) .......... 9, 28

*Davis v. Countrywide Home Loans*,
No. 09-CIV-8606(RJS)(HBP), 2010 WL 3219306 (S.D.N.Y. July 23, 2010) .......... 23

*Dep't of the Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) .......... 23

*Detroit Unity Fund v. Whitmer*,
819 F. App'x 421 (6th Cir. 2020) .......... 20

*Dillard v. Chilton Cnty. Comm'n*,
495 F.3d 1324 (11th Cir. 2007) .......... 12

*Doe v. Pryor*,
344 F.3d 1282 (11th Cir. 2003) .......... 16

*Donald J. Trump for President, Inc. v. Cegavske*,
488 F. Supp. 3d 993 (D. Nev. 2020) .......... 12

*DTC Energy Grp., Inc. v. Hirschfeld*,
912 F.3d 1263 (10th Cir. 2018) .......... 29

*Dugan v. Rank*,
372 U.S. 609 (1963) .......... 21

*Engel v. MODOC*,
4:20-CV-1668 RWS, 2020 WL 76950411 (E.D. Mo. Dec. 28, 2020) .......... 24

*Fairchild v. Hughes*,
258 U.S. 126 (1922) .......... 11

*FDIC v. Meyer*,
510 U.S. 471 (1994) .......... 25

*Feehan v. Wis. Elections Comm'n*,
506 F. Supp. 3d 596, 609 (E.D. Wis. 2020), *appeal dismissed* 2020 WL 9936901 (7th Cir. 2020) .......... 12

*Fleming v. Gutierrez*,
785 F.3d 442 (10th Cir. 2015) .......... 18

*Gabriel v. Weber*,
No. 21-cv-05605, 2021 WL 3475714 (N.D. Cal. Aug. 6, 2021) .......... 28

*Gen. Motors Corp. v. Harry Brown's, LLC*,
563 F.3d 312 (8th Cir. 2009) .......... 9, 28

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) .......... 15

*Glow in One Mini Golf, LLC v. Walz*,
37 F.4th 1365 (8th Cir. 2022) .......... 17, 18

*Goodman v. McDonnell Douglas Corp.*,
606 F.2d 800 (8th Cir. 1979) .......... 20

*Grasso Enters., LLC v. Express Scripts, Inc.*,
809 F.3d 1033 (8th Cir. 2016) .......... 28

*Green Acres Enters., Inc. v. United States*,
418 F.3d 852 (8th Cir. 2005) .......... 9

*Harris v. P.A.M. Transport, Inc.*,
39 F.3d 635 (8th Cir. 2003) .......... 18

*Hercules Inc. v. United States*,
516 U.S. 417 (1996) .......... 22, 23

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) .......... 10

*Honda v. Clark*,
386 U.S. 484 (1967) .......... 23

*Hotze v. Hudspeth*,
16 F.4th 1121 (5th Cir. 2021) .......... 14, 18

*Hum. Rts. Def. Ctr. v. Sherburne Cnty.*,
No. 20-cv-1817, 2020 WL 702840 (D. Minn. Nov. 30, 2020) .......... 29

*Independence-All. Party of Minn. v. Simon*,
--- F. Supp. 3d ---, No. 22-cv-01231, 2022 WL 1537985 (D. Minn. May 16, 2022) .......... 29, 30

*Iowa Right to Life Comm., Inc. v. Smithsonian*,
750 F. Supp. 2d 1020 (S.D. Iowa 2010) .......... 27

*Jachetta v. United States*,
653 F.3d 898 (9th Cir. 2011) .......... 24

*Johnson v. Krebs*,
No. 4:18-cv-04108, 2018 WL 4696754 (D.S.D. Oct. 1, 2018) .......... 27

*Johnson v. Outboard Marine Corp.*,
172 F.3d 531 (8th Cir. 1999) .......... 22

*Johnson-Bey v. United States*,
No. 2:21-CV-6-NCC, 2021 WL 4191615 (E.D. Mo. Sept. 15, 2021) .......... 24, 25, 26

*Jones v. Bush*,
122 F. Supp. 2d 713 (N.D. Tex. 2000), *aff'd without opinion*, 244 F.3d 134 (5th Cir. 2000) .......... 12

*K.B. Calloway Cty. Sch. Dist. Bd. of Edu.*,
No. 5:21-cv-148 (TBR), 2022 WL 125929 (W.D. Ky. Jan. 12, 2022) .......... 27

*Kentucky v. Graham*,
473 U.S. 159 (1985) .......... 21, 22

*King v. Whitmer*,
505 F. Supp. 3d 720 (E.D. Mich. 2020) .......... 20, 30

*Kirby v. City of Elizabeth*,
388 F.3d 440 (4th Cir. 2004) .......... 22

*La Casa de Buena Salud v. United States*,
No. CIV 07-238 JB/RHS, 2008 WL 2323495 (D. N.M. Mar. 21, 2008) ........ 24

*Lance v. Coffman*,
549 U.S. 437 (2007) ........ 10, 11, 12, 13

*Land v. Dollar*,
330 U. S. 731 (1947) ........ 21

*Larson v. Domestic & Foreign Corp.*,
337 U. S. 682 (1949) ........ 21

*Laswell v. Brown*,
683 F.2d 261 (8th Cir. 1982) ........ 25

*Lewis v. Casey*,
518 U.S. 343 (1996) ........ 15

*Little v. Kirkstall Road Enters.*,
No. 19-cv-1786, 2020 WL 435747 (E.D. Mo. Jan. 28, 2020) ........ 8, 9

*Little v. U.S. Dep't of Def.*,
No. 4:21-CV-1309-JAR, 2022 WL 1302759 (E.D. Mo. May 2, 2022) ........ 23, 24, 25

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 9, 10

*Lundt v. Hodges*,
627 F. Supp. 373 (N.D. Iowa 1985) ........ 24

*Mader v. United States*,
654 F.3d 794 (8th Cir. 2011) ........ 23

*Melanson v. Rantoul*,
421 F. Supp. 492 (D.R.I. 1976) ........ 24

*Miller v. Honkamp Krueger Fin. Servs., Inc.*,
9 F.4th 1011 (8th Cir. 2021) ........ 29

*Minn. Voters All. v. Walz*,
492 F. Supp. 3d 822 (D. Minn. 2020) ........ 27

*Missouri ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*,
112 F.3d 1332 (8th Cir. 1997) ........ 25

*Munaf v. Geren*,
553 U.S. 674 (2008) ........ 28

*Nat'l Ass'n for Advancement of Multijurisdiction Prac., v. Howell*,
851 F.3d 12 (D.C. Cir. 2017) ........ 16

*Navy, Marshall & Gordon, PC v. U.S. Int'l Dev.–Coop. Agency*,
557 F.Supp. 484 (D.D.C. 1983) .......... 24

*Nolles v. State Committee for Reorganization of School Districts*,
524 F.3d 892 (8th Cir. 2008) .......... 11

*Novus Franchising, Inc. v. Dawson*,
725 F.3d 885 (8th Cir. 2013) .......... 29

*Okpalobi v. Foster*,
244 F.3d 405 (5th Cir. 2001) .......... 16

*Organization for Black Struggle v. Ashcroft*,
978 F.3d 603 (8th Cir. 2020) .......... 20

*Osborn v. United States*,
918 F.2d 724 (8th Cir. 1990) .......... 9, 18

*Pflum v. United States*,
No. 4:17-CV-579 DGK, 2017 WL 4771172 (W.D. Mo. Aug. 11, 2017) .......... 24

*Phelps-Roper v. City of Manchester*,
697 F.3d 678 (8th Cir. 2012) .......... 17

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 20

*Radford v. United States*,
178 F. Supp. 3d 784 (E.D. Mo. 2016) .......... 24, 26

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
140 S. Ct. 1205 (2020) .......... 20

*Roudachevski v. All-Am. Care Ctrs., Inc.*,
648 F.3d 701 (8th Cir. 2011) .......... 28

*Sabhari v. Reno*,
197 F.3d 938 (8th Cir. 1999) .......... 26

*Schilling v. Rogers*,
363 U.S. 666 (1960) .......... 25

*Scott v. Flowers*,
910 F.2d 201 (5th Cir. 1990) .......... 22

*SD Voice v. Noem*,
987 F.3d 1186 (8th Cir. 2021) .......... 17

*Sexton v. Cernuto*,
18 F.4th 177 (6th Cir. 2021) .......... 23

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) .......... 14

*Sinclair v. Hawke*,
314 F.3d 934 (8th Cir. 2003) .......... 25

*Small Sponsors Working Grp. v. Pompeo*,
No. 1:19-cv-2600, 2020 WL 2561780 (W.D. Tenn. May 20, 2020) .......... 28

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 9, 10, 14

*Taxpayers' Choice Volunteer Comm. v. Roseau Cty.*,
903 F. Supp. 1301 (D. Minn. 1995) .......... 29

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
137 S. Ct. 1645 (2017) .......... 10, 17

*Trump v. Wis. Elections Comm'n*,
983 F.3d 919 (7th Cir. 2020), *cert denied*, 141 S. Ct. 1516 (2021) .......... 20

*Unimex Inc. v. HUD*,
594 F.2d 1060 (5th Cir. 1979) .......... 24

*United States v. Geranis*,
808 F.3d 723 (8th Cir. 2015) .......... 14

*United States v. Metro. St. Louis Sewer Dist.*,
569 F.3d 829 (8th Cir. 2009) .......... 10, 14

*United States v. Nordic Vill.*,
530 U.S. 30 (1992) .......... 23

*United States v. Richardson*,
418 U.S. 166 (1974) .......... 11

*VS Ltd. P'ship v. HUD*,
235 F.3d 1109 (8th Cir. 2000) .......... 26

*Walen v. Burgum*,
No. 1:22-cv-31, 2022 WL 1688746 (D.N.D. May 26, 2022) .......... 20, 30

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 9, 10, 12, 13

*Watkins, Inc. v. Lewis*,
346 F.3d 841 (8th Cir. 2003) .......... 28

*Weinstein v. Bradford*,
423 U.S. 147 (1975) .......... 18

*West v. Atkins*,
487 U.S. 42 (1988) .......... 24

*West v. Lynch*,
845 F.3d 1228 (D.C. Cir. 2017) .......... 14, 15

*Whitfield v. Thurston*,
3 F.4th 1045 (8th Cir. 2021) .......... *passim*

*Winsness v. Yocom*,
433 F.3d 727 (10th Cir. 2006) .......... 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 9, 27

*Wolfe v. Strankman*,
392 F.3d 358 (9th Cir. 2004) .......... 22

*Wood v. Raffensperger*,
501 F. Supp. 3d 1310 (N.D. Ga. 2020) .......... 29, 30

*Wood v. Raffensperger*,
981 F.3d 1307 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1379 (2021) .......... 12, 18, 29

*Ex parte Levitt*,
302 U.S. 633 (1937) .......... 11

*Zutz v. Nelson*,
601 F.3d 842 (8th Cir. 2010) .......... 25

**Statutes**

18 U.S.C. § 245 .......... 24

28 U.S.C. § 1331 .......... 26

28 U.S.C. § 1343 .......... 23

42 U.S.C. § 1983 .......... 1, 23, 24

42 U.S.C. § 1985 .......... 1, 23, 24

52 U.S.C. § 20511 .......... 24

52 U.S.C. § 20901 *et seq* .......... 2

52 U.S.C. § 20922 .......... 2

52 U.S.C. § 20923 .......... 2

52 U.S.C. § 20924 .......... 2

52 U.S.C. § 20928 .......... 2

52 U.S.C. § 20929 .......... 3

52 U.S.C. § 20971 .......... 4, 5

Help America Vote Act (HAVA), Pub. L. No. 107–252, 116 Stat. 1706 (2002) .......... 2

Mo. Ann. Stat. § 115.225.1 .......... 1, 7, 15

Mo. Code Regs. Ann. Tit. 15, § 30-10.020 .......... 7, 17

**Rules**

Fed. R. Civ. P. 4 .......... 22

Fed. R. Civ. P. 12(b)(1) .......... 8

**Other Authorities**

2022 Missouri State House – District 106 Republic Primary Results, Detroit Free Press (Aug. 3, 2022, https://www.freep.com/elections/results/race/2022-08-02-state_house-R-MO -26322/ .......... 17

*All Results: State of Missouri - State of Missouri - Primary Election, August 02, 2022*, https://enr.sos.mo.gov .......... 17

NIST, About NIST, https://www.nist.gov/about-nist .......... 4

U.S. Election Assistance Comm'n, Voluntary Voting System Guidelines, https://www.eac.gov/voting-equipment/voluntary-voting-system-guidelines .......... 2

U.S. Election Assistance Comm'n, Testing and Certification program, https://www.eac.gov/voting-equipment/testing-and-certification-program .......... 3

U.S. Election Assistance Comm'n, State Requirements and the U.S. Election Assistance Commission Voting System Testing and Certification Program, https://www.eac.gov/sites/default/files/TestingCertification/State_Requirements_for_Certification09042020.pdf .......... 3

U.S. Election Assistance Comm'n, FAQ, https://www.eac.gov/voting-equipment/frequently-asked-questions .......... 5

U.S. Election Assistance Comm'n, VVSG Lifecycle Policy,
https://www.eac.gov/sites/default/files/TestingCertification/VVSG_Lifecycle_Policy.pdf ........ 6

## INTRODUCTION

In her First Amended Complaint, *pro se* Plaintiff Alison Graeff, a former candidate for state office in Missouri, purports to assert five claims under 42 U.S.C. §§ 1983, 1985, and Missouri state law, the gravamen of which is that Missouri used improperly certified voting systems used in the November 2020 general election and continues to use the same voting systems today. Plaintiff also seeks the entry of a preliminary injunction.

Insofar as Plaintiff's claims are asserted against the United States Election Assistance Commission (EAC or Commission) and its Commissioners (collectively, the Federal Defendants), these claims should be dismissed for lack of subject matter jurisdiction, for several reasons. First, because Plaintiff asserts only generalized complaints about election administration, she has not alleged any particularized injury-in-fact, as required to establish Article III standing. Second, because Missouri state law commits the selection and certification of voting systems for use in state elections solely to the authority of the Missouri secretary of state, Mo. Ann. Stat. § 115.225.1—and, in any event, Plaintiff's requested relief runs solely against Missouri state officials—she also fails to satisfy the causation and redressability elements of standing with respect to the Federal Defendants. Third, insofar as Plaintiff's claims are premised in part on her former candidacy for state office, any such claims are now moot. And fourth, even assuming—wholly *arguendo*—that Plaintiff has adequately alleged a live "case" or "controversy," her claims independently fail for failure to identify any applicable waiver of sovereign immunity, as required to bring suit against the Federal Defendants.

To the extent Plaintiff's motion for a preliminary injunction is asserted against the Federal Defendants, that motion should likewise be denied. Because this Court lacks subject-matter jurisdiction over the Federal Defendants, Plaintiff has no likelihood of success on any claims purportedly asserted against them. Further, for much the same reasons as Plaintiff's generalized grievance do not confer Article III standing, it also cannot serve as the basis for a showing of irreparable harm, as required for

the entry of such extraordinary relief. Nor do the balance of equities and consideration of the public interest even arguably favor Plaintiff, in the circumstances presented here.

For these reasons—and the others set forth below—the Court should dismiss this action in its entirety as to the Federal Defendants and deny Plaintiff's Motion for a Preliminary Injunction.

## BACKGROUND

### I. Statutory and Regulatory Background

#### A. The Help America Vote Act of 2002

Enacted in 2002, the Help America Vote Act (HAVA), Pub. L. 107–252 Title III, § 302, 116 Stat. 1706 (2002) (codified at 52 U.S.C. § 20901 *et seq.*), made numerous important reforms to the nation's voting processes, including, as relevant here, the creation of the EAC to "serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections[.]" 52 U.S.C. § 20922. Pursuant to the design established by HAVA, the EAC is an independent, bipartisan commission consisting of four commissioners appointed by the President with the advice and consent of the Senate. *Id.* § 20923. The Commission must obtain the approval of at least three of its members to carry out any of its delegated statutory responsibilities, *id.* § 20928; *see also id.* § 20924 (providing for the additional appointment of an Executive Director of the EAC, as well as other agency staff).

HAVA assigns to the EAC several important roles in furtherance of the improvement of the administration of federal elections. As relevant here, key among these responsibilities are the promulgation of the Voluntary Voting System Guidelines (VVSG or Guidelines), which constitute a set of voluntary "specifications and requirements against which voting systems can be tested to determine if the systems meet required standards." U.S. Election Assistance Comm'n, Voluntary Voting System Guidelines, *available at* https://www.eac.gov/voting-equipment/voluntary-voting-system-guidelines, https://perma.cc/EJ93-PP56.

As their name indicates, the VVSG are fully voluntary, and no state or local jurisdiction need adopt or apply them, either fully or partially. Nor is any manufacturer of voting systems federally required to build to VVSG specifications. 52 U.S.C. § 20929; Declaration of Mark A. Robbins (Robbins Decl.) ¶ 9. However, if they choose to do so, states and localities may formally adopt the VVSG, making them mandatory in their jurisdiction.[1] Additionally, in order to facilitate and encourage the use of the VVSG, HAVA further requires that the EAC create a program "for the testing, certification, decertification, and recertification of voting system hardware" against the standards established by the VVSG. *Id.* § 20971(a)(1). The EAC has complied with this directive by establishing and administering its Testing and Certification Program (Program or TCP). *See generally* https://www.eac.gov/voting-equipment/testing-and-certification-program, https://perma.cc/7W3F-LL2N. Like the VVSG themselves, participation is the EAC's Testing and Certification Program is wholly voluntary. However, the requirements of the Program are mandatory for all entities that elect to participate. VSTL Program Manual § 1.4; VSTC Program Manual § 1.4.

**B. The EAC Testing and Certification Program**

In general, the EAC's Testing and Certification Program has two key components, each of which is governed by its own manual that implements corresponding aspects of the Program. First, the Voting System Test Laboratory Program Manual (VSTL Program Manual) sets forth the procedures by which independent laboratories may seek, obtain, and maintain accreditation from the EAC to test voting systems against the requirements of the VVSG. *See generally* VSTL Program Manual (Exhibit B to Robbins Decl.). Laboratories that obtain such accreditation are called Voting System Test Laboratories (VSTLs). Second, the Voting System Testing and Certification Program Manual (VSTC Program Manual) sets forth the procedures applicable to manufacturers of voting systems, as well as to

[1] Information about states' use of the VVSG is available at https://www.eac.gov/sites/default/files/TestingCertification/State_Requirements_for_Certification09042020.pdf, https://perma.cc/5WCM-SK3Z.

accredited VSTLs, for the testing and certification of voting systems to VVSG standards. *See generally* VSTC Program Manual (Exhibit C to Robbins Decl.).

Through the procedures set forth in these respective Manuals, manufacturers of voting systems—in conjunction with accredited VSTLs and the EAC—are able to test new systems, modified systems, or components thereof for comportment with VVSG standards. Manufacturers are also able to obtain certifications of compliance with the applicable version of the VVSG from the EAC. As set forth below (and in more detail in the relevant program manuals), EAC accreditations apply to specific voting systems that have been tested against the VVSG (*i.e.,* not a voting system manufacturer generally). VSTC Program Manual § 5.11.

**1. <u>The VSTL Program Manual: Certification of Testing Laboratories</u>**

By statutory design, EAC does not itself test voting systems for compliance with the VVSG. Rather, HAVA instructed that, within six months of the EAC's adoption of the first VVSG, the National Institute of Standards and Technology (NIST)—a component of the U.S. Department of Commerce charged with the mission of "promot[ing] U.S. innovation and industrial competitiveness by advancing measurement science, standards, and technology in ways that enhance economic security and improve [Americans'] quality of life"[2]—was to "conduct an evaluation of independent, non-Federal laboratories," and "submit to the Commission a list of those laboratories [that NIST] proposes to be accredited to carry out the testing, certification, decertification, and recertification" of voting systems for compliance with the VVSG. 52 U.S.C. § 20971(b)(1); *see also* VSTL Program Manual § 2.3.[3]

However, "[w]hile NIST's recommendation serves as a reliable indication of potential technical competency," the "EAC is the sole authority for Voting System Test Laboratory Accreditation." VSTL

[2] *See* NIST, About NIST, https://www.nist.gov/about-nist, https://perma.cc/GC9X-8RK2.

[3] The NIST program that assesses and proposes qualifying laboratories to the EAC is known as the National Voluntary Laboratory Accreditation Program (NVLAP), and "[a]s a condition of accreditation, all VSTLs must hold a valid accreditation from [NVLAP.]" VSTL Program Manual § 2.4.

Program Manual § 3.4. Thus, after the EAC receives the recommendations from NIST, the EAC conducts further review of the recommended laboratories to address non-technical issues such as conflict of interest policies, organizational structure, and recordkeeping protocols, and then votes on the final accreditation of qualified laboratories. 52 U.S.C. § 20971(b)(2)(A); *see also* U.S. Election Assistance Comm'n, Frequently Asked Questions, *available at* https://www.eac.gov/voting-equipment/frequently-asked-questions, https://perma.cc/X62A-LHRT (VVSG FAQ). Importantly, once the EAC Commissioners vote to accredit a VSTL for participation in the Testing and Certification Program, the accreditation may only be revoked upon a further, affirmative vote of the Commissioners to effectuate a revocation. 52 U.S.C. § 20971(c)(2).

An EAC accreditation of a VSTL is expressly limited to the version(s) of the VVSG that the VSTL is, at the time of accreditation, authorized to test against. VSTL Program Manual § 3.7.1. When the VVSG are updated—as they are periodically, including most recently through the adoption of VVSG 2.0 on February 21, 2021, Robbins Decl. ¶ 5—a VSTL must obtain a new accreditation in order to obtain authorization to test voting systems against the new VVSG. VSTL Program Manual § 3.7.1.[4]

### 2. The VSTC Program Manual: Testing and Certification of Voting Systems to the VVSG

Once a VSTL has been accredited by the EAC, it is authorized to evaluate voting systems and software against the VVSG to determine whether the voting system or voting software meets the Guidelines' standards for functionality, accessibility, and security capabilities. However, the VSTL does not itself certify VVSG compliance; rather, after completion of testing, the VSTL submits a

[4] Although not directly relevant to this suit, the VSTL Program Manual further sets forth in detail, among other things, the policies and procedures of the EAC's Compliance Management Program—through which the EAC conducts continual oversight of accredited VSTLs to ensure their ongoing compliance with all substantive and procedural requirements of the Testing and Certification Program. *See* VSTL Program Manual §§ 4.1-4.10.3. When a VSTL is found to be in noncompliance with Program requirements, the VSTL Program Manual further sets forth specific procedures by which a VSTL may correct the identified issue(s), and by which the EAC may, if necessary and warranted under the terms of the Program, revoke the VSTL's accreditation. *See id.* Chapter 5.

recommendation for certification to the EAC, which makes the final determination as to whether a given voting system or software program should be certified. VSTC Program Manual §§ 3.1-3.2, 3.2.3. The VSTC Program Manual sets forth, in detail, the policies and procedures that apply to both (1) manufacturers in submitting their voting systems (or components thereof, and/or updates thereto, as applicable) to a VSTL for testing, and (2) VSTLs in conducting authorized testing against the VVSG, and making recommendations to the EAC as to whether a particular voting system should be certified as VVSG-compliant. *See generally* VSTC Program Manual.

Once a particular voting system has been certified as VVSG-compliant by the EAC, it retains its certification indefinitely, unless it undergoes a qualifying modification requiring that it be re-tested and re-certified, or is required to be affirmatively de-certified under the terms of the Program. *See id.* §§ 3.3-3.3.4, 3.5-3.5.5 (explaining when certification is required under the terms of the Program, including, for example, when a change to previously-certified system is not "de minimui"); *id.* Chapter 7 (setting forth triggers and procedures for the de-certification of previously certified systems that no longer meet applicable VVSG standards). *See generally* VVSG Lifecycle Policy (Exhibit A to Robbins Decl.).

### 3. **<u>Cooperative Federalism Principles in Use of EAC Certifications by States and Localities</u>**

As explained above, there is no federal requirement that states or localities use VVSG-compliant voting systems to conduct their elections. However, states and localities may, voluntarily, set such requirements by law or policy. Consistent with the "cooperative federalism" principles underlying the EAC's Testing and Certification Program, when a state or locality chooses to avail itself of the VVSG and/or the Program, the state or locality retains for itself several important roles to play in the selection and certification of voting systems for use in its elections. Specifically, as provided by the VSTC Program Manual, state and local officials are responsible for: "testing voting systems to ensure the system will support the specific requirements of each individual State," VSTC Program Manual

§ 1.6.1.2; "performing acceptance testing to ensure that the equipment delivered is identical to the equipment certified at the federal and state levels [and] is fully operational," *id.* § 1.6.1.4; and "confirm[ing] [that] equipment is operating properly and is unmodified from its certified state," *id.* § 1.6.1.5. *See also id.* § 3.2.3 (explaining the limitation of an EAC-issued voting system certification).

### C. Missouri's State Law Requirements for the Certification of Voting Systems

Pursuant to Missouri state law, "[b]efore use by election authorities" in state elections, the Missouri "secretary of state shall approve the marking devices and the automatic tabulating equipment used in electronic voting systems." Mo. Ann. Stat. § 115.225.1. While such approval requires, as one condition precedent (among several specified by state law), that the voting system in question have "been tested and … certified by an independent authority that meets the voting system standards developed by the Federal Election Commission or its successor agency," *id.* § 115.225.2(10), Missouri law does not require EAC certification of the voting system itself. Rather, Missouri law places the authority to certify voting systems as meeting the state's requirements for use in state elections solely within the authority of the Missouri secretary of state, and requires that this state official independently approve the "independent testing authority" that issued the applicable voting system certification. *Id.* § 115.225.1; *see also* Mo. Code Regs. Ann. tit. 15, § 30-10.020 ("As a prerequisite to approval from the secretary of state, each manufacturer or supplier of electronic voting systems or equipment . . . shall have received certification from an independent testing authority approved by the secretary of state.").

## II. Procedural Background

Plaintiff filed her initial complaint in this action on June 28, 2022. *See generally* Compl., ECF No. 1. On the same day, Plaintiff sought an *ex parte* temporary restraining order. *See* Request for TRO 5, ECF No. 3. On June 30, 2022, the Court denied that motion and ordered Plaintiff to serve process on all named Defendants prior to filing any motion for preliminary injunction. *See* Mem. & Order, ECF No. 6. On July 14, 2022, Plaintiff filed a motion for preliminary injunction, requesting that the court

preliminarily enjoin Defendants "from implementing or enforcing the use of electronic voting machines, equipment, and electronic poll pads in the August 2nd 2022 Missouri Primaries and November 8th 2022 Missouri General Election" and seeking to enjoin the Missouri secretary of state and other state election officials "from deletion, destruction, disposal, or altering" data related to the November 3, 2020 election. *See* Mot. for Prel. Inj. 15, ECF No. 8 (PI Mot.). On the same day, Plaintiff sought leave to file an amended complaint, *see* Pl. Mot. for Leave to File First Am. Pet., ECF No. 7; the Court denied that motion as moot and ordered Plaintiff to file her First Amended Complaint by July 25, *see* Order 2, ECF No. 17. Plaintiff filed her First Amended Complaint on July 22, 2022, alleging five claims against all Defendants, and seeking (1) "[t]he immediate and permanent removal of the State of Missouri from the Federal mandates under the HAVA," (2) "[t]he immediate and permanent removal of all electronic voting machines, equipment, and poll pads in the State of Missouri"; (3) the "immediate[] return" of the State "to hand-cast[] and hand-counted paper ballots"; (3) a preliminary and permanent injunction against Defendants prohibiting them from "implementing or enforcing the use of electronic voting machines, equipment, and electronic poll pads . . . in all future Missouri elections"; and (4) an order prohibiting state election officials "from deletion, destruction, disposal, or altering of all election data pertaining to the November 3, 2020 General election in the State of Missouri." First Am. Compl. (FAC) p. 49-50, ECF No. 23.

## LEGAL STANDARD

### I. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal for "lack of subject-matter jurisdiction." *See* Fed. R. Civ. P. 12(b)(1). "The purpose of a Rule 12(b)(1) motion is to allow the court to address the threshold question of jurisdiction, as 'judicial economy demands that the issue be decided at the outset rather than deferring it until trial.'" *Little v. Kirkstall Road Enters.*, No. 19-cv-1786, 2020 WL 435747, at *1 (E.D. Mo. Jan. 28, 2020) (quoting *B.A. v. Missouri*, No. 2:16-cv-72, 2017 WL 106433, at

*1 (E.D. Mo. Jan. 11, 2017)). "The plaintiff 'bears the burden of proving the existence of subject-matter jurisdiction[.]'" *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019). Because jurisdiction is a threshold question, the court may look outside the pleadings in order to determine whether subject matter jurisdiction exists." *Green Acres Enters., Inc. v. United States*, 418 F.3d 852 (8th Cir. 2005) (citing *Osborn v. United States*, 918 F.2d 724, 728-30 (8th Cir. 1990)).

## II. **Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "The party seeking a preliminary injunction bears the burden of establishing the necessity of this equitable remedy." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009). When considering a motion for preliminary injunction, courts weigh four factors: "(1) the threat of irreparable harm to the moving party; (2) the weight of this harm as compared to any injury an injunction would inflict on other interested parties; (3) the probability that the moving party will succeed on the merits; and (4) the public interest." *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).

# **ARGUMENT**

## I. **Plaintiff Cannot Establish Article III Standing Against the Federal Defendants**

Article III "limits the category of litigants empowered to maintain a lawsuit in federal court" to those with "actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). In comportment with this bedrock principle, a showing of standing is a "threshold question in every federal case[.]" *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The "irreducible constitutional minimum" of standing requires a plaintiff to demonstrate an injury-in-fact that is: (1) concrete and particularized, and actual or imminent, not conjectural or hypothetical, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833-34 (8th Cir. 2009).

"[S]tanding is not dispensed in gross," and must, "[t]o the contrary," be demonstrated "for each claim [a plaintiff] seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Ests., Inc.,* 137 S. Ct. 1645, 1650 (2017) (citations omitted). Here, Plaintiff fails to establish *any* of the required Article III elements as to the Federal Defendants, and her suit should, accordingly, be dismissed in its entirety for lack of subject matter jurisdiction as to these Defendants.

### A. Plaintiff Has Not Alleged Any Cognizable Injury-in-Fact

To be "particularized," an injury-in-fact must "affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1547 (citation omitted). The very opposite of a particularized injury is a "generalized grievance"—that is, an asserted injury "shared in substantially equal measure by all or a large class of citizens[.]" *Warth*, 422 U.S. at 499. Such a generic grievance—"undifferentiated and common to all members of the public," *Lujan*, 504 U.S. at 575—can never support standing, "no matter how sincere." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013); *Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (emphasizing that "a grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact'"). This longstanding and familiar limit "serves vital interests going to the role of the Judiciary in our system of separated powers." *Hollingsworth*, 570 U.S. at 715.

The Supreme Court, the Eighth Circuit, and courts across the country have consistently applied these requirements, with full force, in the election context. In *Lance v. Coffman*, 549 U.S. 437 (2007) (per curiam), for example, a group of voters alleged that a provision of the Colorado Constitution permitting congressional redistricting only once per census violated their Elections Clause right to have their elected representatives set their congressional districts. *See id.* at 438. The Supreme Court held that the voters lacked Article III standing because "[t]he only injury" the plaintiffs had asserted was "that the laws—specifically the Elections Clause—[had] not been followed." *Id.* at 442. The Supreme Court held that this was "precisely the kind of undifferentiated, generalized grievance about the conduct of

government that we have refused to countenance[.]" *Id.*; *see also id.* at 439-40 (invoking a "lengthy pedigree" of cases establishing the Court's "refusal to serve as a forum for generalized grievances") (citing *Fairchild v. Hughes*, 258 U.S. 126 (1922), *Ex parte Levitt*, 302 U.S. 633 (1937) (per curiam), and *United States v. Richardson*, 418 U.S. 166 (1974)).

Likewise binding on this Court is the Eight Circuit's decision in *Nolles v. State Committee for Reorganization of School Districts*, 524 F.3d 892 (8th Cir. 2008), where a group of Nebraska voters challenged the implementation of a state bill pertaining to school district reorganization, prior to a referendum vote which ultimately repealed the bill. *Id.* at 896. Under Nebraska law, the referendum petition had been signed by a sufficient number of voters to send the bill to a referendum vote, but not enough to suspend the operation of the bill pending the result of the election. *Id.* Although voters ultimately repealed the state bill in the general election, the repeal did not authorize the re-establishment of previously dissolved school districts. *Id.* at 897. Relying directly on *Lance*, the Eighth Circuit rejected the plaintiffs' theory of standing, which was premised on an assertion that the implementation of the state bill prior to the referendum vote rendered their vote in the referendum election ineffective, resulting in a fundamentally unfair election process in violation of their right to substantive due process. *Id.* at 897-98. The court cited *Lance* for the proposition that "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy," *id.* at 899 (quoting *Lance*, 549 U.S. at 439). The court thus held that the plaintiffs had failed "to allege a specific individualized injury . . . resulting from the allegedly unfair election, that is, an injury not shared by all the voters who voted as they did in the referendum election." *Id.* at 900. *Lance* and *Nolles* thus clearly establish that a plaintiff may not bring an election suit asserting merely "'a general interest common to

all members of the public,'" or arising from an undifferentiated belief that votes in general may be miscounted or diluted. *Lance, 549 U.S.* at 440 (citation omitted).

Similar cases, moreover, abound across the federal court system. *See, e.g., Crist v. Comm'n on Presidential Debates*, 262 F.3d 193, 195 (2d Cir. 2001) (per curiam); (concurring with other circuit courts that "a voter fails to present an injury-in-fact when the alleged harm is abstract and widely shared …"); *accord Becker v. Fed. Election Comm'n*, 230 F.3d 381, 389 (1st Cir. 2000) (holding that "the harm done to the general public by [alleged] corruption of the political process is not a sufficiently concrete, personalized injury to establish standing"); *Jones v. Bush*, 122 F. Supp. 2d 713 (N.D. Tex. 2000) (dismissing, for lack of standing, suit by voters challenging the qualifications of then-Governor George W. Bush and Richard Cheney to be elected President and Vice-President of the United States, respectively, on the grounds that they were both "inhabitants" of Texas in violation of the requirement of the Twelfth Amendment), *aff'd without opinion*, 244 F.3d 134 (5th Cir. 2000).[5]

Here, the gravamen of Plaintiff's suit is an overarching complaint about the general administration of Missouri state elections (inclusive of the state's use of voting system certifications made pursuant to the EAC's Testing and Certification Program)—which is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court has]

---

[5] *See also, e.g., Wood v. Raffensperger,* 981 F.3d 1307, 1314 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1379 (2021) (dismissing for lack of standing a suit claiming vote dilution resulting from Georgia's purportedly unlawful processing of absentee ballots, and explaining that such allegations are a "'paradigmatic generalized grievance'" because "'no single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'") (quoting *Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 356 (3d Cir. 2020), *vacated as moot*, 141 S. Ct. 2508 (2021)); *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1333 (11th Cir. 2007) (per curiam) (holding that "an asserted interest in being free of an allegedly illegal electoral system" is not a particularized injury); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. 2020) (voter dilution "allegations are nothing more than generalized grievances that any[one] . . . who voted could make if they were so allowed") (collecting cases); *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609 (E.D. Wis. 2020) ("The plaintiff has not alleged that, as a voter, he has suffered a particularized, concrete injury sufficient to confer standing."), *appeal dismissed* 2020 WL 9936901 (7th Cir. 2020); *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1000 (D. Nev. 2020) ("Even if accepted as true, plaintiffs' pleadings allude to vote dilution that is impermissibly generalized.").

refused to countenance[.]" *Lance*, 549 U.S. at 442; *Warth*, 422 U.S. at 499 ("[W]hen the asserted harm is … shared in substantially equal measure by . . . a large class of citizens," it is not a particularized injury). Indeed, Plaintiff herself recognizes that the injuries that she alleges—namely, the purported loss of her right to express her political opinion through voting (or not voting) and living under an allegedly fraudulent government—apply with equal force to "the Missouri population as a whole." *See* FAC p. 40 (alleging that "[i]f the EAC and Missouri Secretary of State fail to safeguard our elections . . . then [Plaintiff's] First Amendment rights, as well as all other Missouri citizen[s'] rights have been violated"). Thus, because Plaintiff's asserted injury is generalizable to all members of the public—and she cannot explain how her interest in compliance with election laws differs from that of any other voter—it constitutes a paradigmatic generalized grievance that cannot supply an injury-in-fact.

Plaintiff is not only a voter and a citizen of Missouri, but, as noted in her Amended Complaint, she also ran as a candidate in the August 2, 2022 primary for the Missouri House of Representatives. *See* FAC p. 2. In some circumstances, candidates have standing to challenge the terms of the election based on a concrete and particularized injury based on their candidacy. *See, e.g.*, *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) (finding that, in that case, "the Electors have standing as candidates" because "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors")) *see also Whitfield v. Thurston*, 3 F.4th 1045, 1047 (8th Cir. 2021) (recognizing that the plaintiff's "interest in this case was predicated on his status as an Independent candidate"). But although Plaintiff describes herself "[a]s a candidate, a citizen, and a voter," she does not assert a concrete or particularized injury to herself as a candidate. Rather, she focuses entirely on purported injuries to herself as a citizen and a voter. *See, e.g.*, FAC p. 37 (alleging that the current system "nullifies any vote cast through electronic voting systems" and that "[t]his violates [Plaintiff's] rights as a citizen" and "silences [her] voice as a voter, eliminating [her] right to express [her] political opinion on who governs [her] state and [her] fundamental right to vote"); *see also id.* at 37-41. Accordingly, notwithstanding her former status as a

candidate, Plaintiff has not alleged the existence of any particularized injury related to her candidacy or that "affect[s] [her] in a personal and individual way," and therefore cannot establish standing. *Spokeo,* 578 U.S. at 339; *cf. Carson*, 978 F.3d at 1058 (holding that plaintiffs had identified a "concrete and particularized injury to candidates"); *see also Hotze v. Hudspeth*, 16 F.4th 1121, 1124 n.2 (5th Cir. 2021) (notwithstanding plaintiffs' status as candidates, "[j]ust challenging the 'integrity' of the voting process is too general to suffice").

Even if Plaintiff could identify a concrete and particularized injury to herself as a candidate, that injury would only provide standing to challenge the August 2, 2022 election, not all future elections in the state of Missouri. *See Whitfield*, 3 F.4th at 1047; *see also Hotze*, 16 F.4th at 1124-25 (noting that if the plaintiffs had standing to challenge election procedures as candidates, "that standing would pertain only to their claim as to . . . the only election in which they claimed to be candidates"). As explained further below, the August 2, 2022 primary has come and gone, and Plaintiff's requests for relief related to that election are now moot. *See* § II, *infra.*

### B. Plaintiff's Asserted Injury Is Also Not "Fairly Traceable" to the Federal Defendants, or Capable of Being Remedied Through Them

Even assuming, wholly *arguendo*, that Plaintiff has alleged a cognizable injury-in-fact, the alleged injury must also be "fairly traceable to the defendant's conduct" and capable of being remedied by a favorable decision against the defendant in question. *United States v. Geranis*, 808 F.3d 723, 727 (8th Cir. 2015) (citing *Metro. St. Louis Sewer Dist.,* 569 F.3d at 834). Plaintiff likewise fails to satisfy these elements of standing as to the Federal Defendants.

The causation and redressability elements of Article III standing are closely linked, because "a federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant[.]'" *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976)). "[C]ausation focuses on the 'connection between the assertedly unlawful conduct and the alleged injury,' whereas redressability focuses on the 'connection between the alleged injury and the judicial relief requested.'" *West v. Lynch*,

845 F.3d 1228, 1235-36 (D.C. Cir. 2017) (quoting *Allen v. Wright,* 468 U.S. 737, 753 (1984)). Thus, "Article III standing to sue each defendant also requires a showing that each defendant caused [the plaintiff's] injury and that an order of the court against each defendant could redress the injury." *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (explaining that because standing is not "dispensed in gross," a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury.") (citation omitted); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.") (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

As explained above, state reliance on EAC certifications of voting systems as VVSG-compliant is entirely at the discretion of the states—and, in Missouri, the certification and selection of voting systems for use in state elections is committed solely to the authority of the Missouri secretary of state. Mo. Ann. Stat. § 115.225.1 (providing that "[b]efore use by election authorities" in state elections, the Missouri "secretary of state shall approve the marking devices and the automatic tabulating equipment used in electronic voting systems"); *see also* Mo. Code Regs. Ann. Tit. 15, § 30-10.020 (related state regulation, requiring "as a prerequisite to approval from the secretary of state," that "each manufacturer or supplier of electronic voting systems or equipment . . . shall have received certification from an independent testing authority approved by the secretary of state."). Moreover—and perhaps in recognition of this dispositive state law—Plaintiff's requested relief in this action runs *solely* against Missouri state officials. *See* FAC Prayer for Relief (lines 1184-1200) (requesting, *inter alia*, "[t]he immediate and permanent removal of all electronic voting machines, equipment, and poll pads in the State of Missouri," the "[i]mmediate[] return [of] the State of Missouri to hand-cast, and hand-counted paper ballots," and the entry of an injunction against "the use of electronic voting machines, equipment, and electronic poll pads … in all future Missouri elections").

Simply put, the Federal Defendants have neither any direct role to play in the Missouri secretary of state's decision whether to certify voting equipment for use in state elections, nor any legal authority relevant to the same. And where—as here—the defendants in question lack any control or enforcement authority over a challenged statute or policy, courts have consistently dismissed plaintiffs' claims for failure to establish causation and/or redressability. *Nat'l Ass'n for Advancement of Multijurisdiction Prac.*, *v. Howell*, 851 F.3d 12, 17 (D.C. Cir. 2017) (dismissing claims for lack of standing, where the plaintiff "failed to identify any role whatsoever" of the defendants "in promulgating or enforcing" the challenged rules); *Calzone*, 866 F.3d at 869 (dismissing on standing grounds claims against various state entities which lack enforcement authority over the challenged provision); *Okpalobi v. Foster,* 244 F.3d 405, 426 (5th Cir. 2001) (*en banc)* ("The requirements of *Lujan* are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute."); *Doe v. Pryor*, 344 F.3d 1282, 1285 (11th Cir. 2003) (dismissing claims on standing grounds where "[t]he only defendant in this case is the Alabama Attorney General, and the only injuries J.B. has alleged stem from a state court custody proceeding in which the Attorney General played no role. The Attorney General has taken no action to enforce the [challenged policy] against J.B."); *Winsness v. Yocom,* 433 F.3d 727, 737 (10th Cir. 2006) (no standing where "defendants did not issue the [challenged] citation … and are not responsible for maintaining any record of it").

Thus, even assuming (wholly *arguendo*) that Plaintiff's alleged generalized grievance regarding the certification of voting systems for use in Missouri state elections constitutes a justiciable injury-in-fact, any such injury was not caused by the Federal Defendants, nor is it even arguably redressable through them. Plaintiffs' purported claims against the Federal Defendants should also be dismissed on these independent grounds.

## II. Plaintiffs' Claims with Respect to the August 2, 2022 Primary Are Moot

### A. The Requested Relief Is Moot Because the Primary Has Already Occurred

As explained above, Plaintiff's claims should be dismissed for lack of standing. But even assuming *arguendo* that Plaintiff could establish standing based on her candidacy in the August 2, 2022 election, such standing would pertain only to claims and relief related to that election. *Town of Chester*, 137 S. Ct. at 1650 (plaintiff must establish standing for each claim pressed and each form of relief sought). Because that election has come and gone, however, any such claims are now moot.

"'Under Article III of the Constitution, [courts] may adjudicate only actual, ongoing cases or controversies. When the issues presented in a case are no longer live, the case is moot and is therefore no longer a "Case" or "Controversy" for purposes of Article III.'" *Whitfield*, 3 F.4th at 1047 (quoting *SD Voice v. Noem*, 987 F.3d 1186, 1188-89 (8th Cir. 2021)). In other words, "[w]hen, during the court of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief,' the case is considered moot." *Glow in One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1371 (8th Cir. 2022) (quoting *Ali v. Cangem*i, 419 F.3d 722, 723 (8th Cir. 2005) (en banc)). A case will become moot "when the 'requisite personal interest' that gave the plaintiff standing to bring the suit disappears as the case proceeds." *Whitfield*, 3 F.4th at 1047 (quoting *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012)). Thus, if a plaintiff's interest in a case is predicated on his or her status as a candidate in an election, and that election has passed, the case "is no longer 'live'" and is instead moot. *Id.* That is precisely what has happened here. Plaintiff was listed a candidate for Missouri State Representative in the August 2, 2022 primary. *See* FAC p 2. The primary took place as scheduled on August 2, and Plaintiff did not prevail. *See All Results: State of Missouri - State of Missouri - Primary Election, August 02, 2022*, Mo. Sec'y of State (last visited August 10, 2022), https://enr.sos.mo.gov; *see also* 2022 Missouri State House – District 106 Republic Primary Results, Detroit Free Press (Aug. 3, 2022), https://www.freep.com/elections/results/race/2022-08-

02-state_house-R-MO-26322/, https://perma.cc/SHT9-C4DA.[6] Because the primary has already occurred, the court can no longer offer effective relief with respect to that election and Plaintiff's claims are moot. *Glow in One Mini Golf*, 37 F.4th at 1371-72. In her Amended Complaint, Plaintiff seeks a variety of forms of relief, all of which are prospective. *See* FAC p. 49-50 (requesting, among other things, "[t]he immediate and permanent removal of all electronic voting machines, equipment, and poll pads in the State of Missouri," an "immediate[] return" to "hand-cast and hand-counted paper ballots," and an injunction prohibiting defendants from "implementing or enforcing" the use of electronic voting equipment in the State). Setting aside the question of whether such relief would have been appropriate before the primary, none of the requested relief can have any impact on that election now that it has already come and gone. The Court cannot "turn back the clock and create a world in which" voters were not permitted to use electronic voting machines. *Wood*, 981 F.3d at 1317 (quoting *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015)); *see also Hotze*, 16 F.4th at 1124 (holding that claims are moot with respect to an election that has already passed).

**B. <u>No Exception to the Mootness Doctrine Applies In this Case</u>**

Plaintiff cannot save her claims by invoking the capable-of-repetition-yet-evading review exception to mootness. Under this doctrine, a court may consider a case that would otherwise be moot if "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Whitfield*, 3 F.4th at 1047 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). The party invoking the exception has the burden of demonstrating that it applies. *Id.* (citing *Abdurrahman v. Dayton*, 903 F.3d 813, 817 (8th Cir. 2018)). Plaintiff cannot do so here.

[6] Although the results of the election are not alleged in the Amended Complaint, it is well-established that a district court "has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1)." *Harris v. P.A.M. Transport, Inc.*, 39 F.3d 635, 637 n.4 (8th Cir. 2003) (quoting *Osborn v. United States*, 918 F.2d 724, 728 n.4 (8th Cir. 1990)).

First, Plaintiff alleges that many of the issues she has identified have existed since the November 2020 election, *see, e.g.*, FAC p. 15-21, and thus there is no argument these issues did not exist long enough to be fully litigated prior to the August 2, 2022 primary or that similar issues could not be litigated in advance of a future election (assuming that a plaintiff exists who would have standing to bring such claims, and that the claims were otherwise justiciable). Second, there is no reason to believe that Plaintiff herself will be subjected to the same circumstances in any future election. *Whitfield*, 3 F.4th 1047 (applying the same-complaining-party requirement in election cases). Plaintiff did not prevail in the primary election, and therefore will not be a candidate in the upcoming general election, and there is no indication in the Amended Complaint or elsewhere in the record that she intends to run in another future election. Even if Plaintiff were to run in a future election, it is purely speculative whether the same conditions would exist at that time.

### C. <u>Plaintiff's Claims Became Moot Due to Her Own Delay</u>

Nor can Plaintiff save her claims by arguing that they only became moot while her motion for preliminary injunction was pending. As an initial matter, that does not change the fact that the Court lacks subject-matter jurisdiction over her claims. Moreover, this result stems primarily from Plaintiff's own delinquency in pursuing her claims.

As this Court has recognized, "this action has not been expeditiously filed." Order 3, ECF No. 27 ("Scheduling Order"). Plaintiff's Amended Complaint contains a number of allegations relating to the November 3, 2020 election, which occurred nearly two years ago, and Plaintiff attached to her complaint an "Affidavit in Support of Notice and Demand of Maladministration" bearing her signature and dated February 2022, which contains many of the same factual allegations found in her complaint. *See* FAC Ex. 24, ECF No. 23-5. Yet Plaintiff waited until June 28, 2022—only 35 days before the August 2, 2022 primary—to initiate this litigation. *See* ECF No. 1. And after the Court denied her initial request for a temporary restraining order on June 30, she inexplicably waited yet another 14 days to move for a

preliminary injunction on July 14, 2022—only 19 days before the primary. *See* PI Mot. In doing so, Plaintiff "ask[ed] this Court to provide extraordinary and expedited relief that would potentially dismantle the election process in [Missouri] on the eve of the election," an outcome that is heavily disfavored. Scheduling Order 3; *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)) (noting that the Supreme Court "has repeatedly emphasized that lower courts should ordinarily not alter the election rules on the eve of an election"); *Organization for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020). Indeed, courts may reject requests for last-minute changes to election procedures for precisely that reason. *See, e.g.*, *Berry v. Ashcroft*, No. 4:22-cv-00465, 2022 WL 2643504, at *2-3 (E.D. Mo. July 8, 2022) (applying *Purcell* where "Missouri's primary elections are in less than one month and multiple key deadlines have already passed"); *Walen v. Burgum*, No. 1:22-cv-31, 2022 WL 1688746, at *5-6 (D.N.D. May 26, 2022).

Courts may similarly invoke the doctrine of laches to reject challenges to elections that have already occurred where the plaintiff delayed too long before suing. *See, e.g.*, *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 925-26 (7th Cir. 2020) (finding that the doctrine of laches barred relief where allowing a candidate to raise arguments too late "would impose unquestionable harm on the defendants, and the State's voters, many of whom cast ballots in reliance on the guidance, procedures, and practices that the President challenges here"), *cert denied*, 141 S. Ct. 1516 (2021); *Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (affirming district court's decision that claims related to election were "barred by laches, considering the unreasonable delay on the part of [p]laintiffs and the consequent prejudice to [d]efendants"); *King v. Whitmer*, 505 F. Supp. 3d 720, 731-32 (E.D. Mich. 2020) (concluding that the plaintiffs' delay in initiating their lawsuit "results in their claims being barred by laches"). "For the application of the doctrine of laches to bar a lawsuit, the plaintiff must be guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979). Here, Plaintiff inexplicably and unreasonably delayed filing her

complaint until one month before the August 2, 2022 primary and then further delayed notifying the Federal Defendants of this litigation and seeking preliminary relief. Even if Plaintiff's claims were not moot, they would be properly barred by the doctrine of laches. By waiting until the eve of an election to seek preliminary relief based on alleged issues that purportedly came to light years prior, Plaintiff knowingly took the risk that her case would become moot while her motions were pending.

## III. This Court Otherwise Lacks Subject Matter Jurisdiction to Entertain Plaintiffs' Purported Claims Against the Federal Defendants

Even if—wholly *arguendo*—Plaintiff had Article III standing as to any of the Federal Defendants, she has not met her burden to identify an applicable waiver of sovereign immunity allowing her to assert any of her purported claims against them. This Court should therefore dismiss this suit as to the Federal Defendants on this independent ground, as well.

### A. No Individual Capacity Claims Against Federal Officials Have Been or May Be Asserted Here

As an initial matter, the Federal Defendants note that, although Plaintiff purports to name the current EAC Commissioners in both their official and individual capacities, her claims—which seek only injunctive and declaratory relief to the extent they run against Federal Defendants at all—are in fact only asserted against them in their official capacities. As the Supreme Court recognized in *Dugan v. Rank*, 372 U.S. 609 (1963), "[t]he general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Id.* at 621 (quoting, respectively, *Land v. Dollar*, 330 U. S. 731, 738 (1947)), and *Larson v. Domestic & Foreign Corp.*, 337 U. S. 682, 704 (1949)). Here, Plaintiffs' operative complaint seeks only injunctive relief (albeit only against Missouri state defendants)—which, under *Dugan*, amounts to an "official capacity" claim that is "only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *see also Larson*, 337 U.S. at 688 (explaining

that "the sovereign can act only through agents and, when the agents' actions are restrained, the sovereign itself may, through him, be restrained"); *Cmty. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd.*, 150 F. App'x 389, 401 (6th Cir. 2005) ("Just as a plaintiff cannot sue a defendant in his official capacity for money damages, a plaintiff should not be able to sue a defendant in his individual capacity for an injunction in situations in which the injunction relates only to the official's job, *i.e.*, his official capacity."); *Kirby v. City of Elizabeth*, 388 F.3d 440, 452 n.10 (4th Cir. 2004) (concluding that injunctive relief can only be awarded against a government employee in his or her official capacity); *Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004) ("[T]he declaratory and injunctive relief Wolfe seeks is only available in an official capacity suit."); *Scott v. Flowers*, 910 F.2d 201, 213 (5th Cir. 1990) ("[T]he injunctive relief sought and won by Scott can be obtained from the defendants only in their official capacity as commissioners.").

Thus, because Plaintiff here seeks only injunctive relief—and herself characterizes her complaints against the Commissioners as relating to actions taken "in [their] capacity" as Commissioners, *see* FAC p. 3 lines 30-31, 41-42, 51—her asserted claims against the Commissioners in fact lie against the EAC itself. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) (explaining that "a] suit against a public employee in his or her official capacity is merely a suit against the public employer") (citing *Kentucky,* 473 U.S. at 165).[7]

### B. <u>Plaintiff Has Not Identified Any Waiver of Sovereign Immunity Applicable to the Federal Defendants</u>

An axiomatic limit on federal court jurisdiction is that "the United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any

[7] The Department of Justice notes that it is not appearing for or defending any of the EAC Commissioners in their individual capacities because they have not properly been sued in their individual capacities. However, the Department of Justice notes that Plaintiff has not filed on the docket any proof that the Commissioners have been served in their individual capacities. *See* Fed. R. Civ. P. 4(e) & (i)(3) (requiring United States officers sue in an individual capacity to be personally served with process, regardless of whether the official is also sued in an official capacity).

court define that court's jurisdiction to entertain the suit." *Hercules Inc. v. United States*, 516 U.S. 417, 422 (1996) (quotation omitted). Only Congress has the authority to waive sovereign immunity. *See Mader v. United States*, 654 F.3d 794, 797 (8th Cir. 2011). When Congress does so, it is permitted to define the conditions. *See Honda v. Clark*, 386 U.S. 484, 501 (1967); *see also Mader*, 654 F.3d at 797. Ambiguous statutory language is not sufficient to waive sovereign immunity, nor is the existence of even a "plausible" interpretation that the statute might subject the United States to suit. *United States v. Nordic Vill.*, 530 U.S. 30, 34-37 (1992). In addition, all potential waivers must be interpreted narrowly and in favor of the United States. *See Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). Because Plaintiff has failed to identify any applicable waiver relevant to the claims she purports to assert against the Federal Defendants, all such claims must be dismissed on this ground.

**1. <u>28 U.S.C. § 1343 and 42 U.S.C. §§ 1983, 1985</u>**

28 U.S.C. § 1343 conveys to U.S. district courts original jurisdiction over claims brought under civil rights statutes and the Constitution. *See Davis v. Countrywide Home Loans*, No. 09-CIV-8606(RJS)(HBP), 2010 WL 3219306, at *7 (S.D.N.Y. July 23, 2010); *Sexton v. Cernuto*, 18 F.4th 177, 183 (6th Cir. 2021). It is, in essence, the "jurisdictional counterpart" to damages suits brought under, *inter alia*, 42 U.S.C. §§ 1983 and 1985, which, respectively, recognize causes of action for deprivation of rights under color of state law and conspiracies to interfere with civil rights. However, as this Court has recognized, while Section 1343 "confers jurisdiction to this Court over certain types of claims, it 'do[es] not waive the sovereign immunity of the United States[.]'" *Little v. U.S. Dep't of Def.*, No. 4:21-CV-1309-JAR, 2022 WL 1302759, at *4 (E.D. Mo. May 2, 2022) (quoting *Bell v. Schafer*, No. 4:08-CV-1030 ERW, 2009 WL 2182170, at *3 (E.D. Mo. July 22, 2009)); *see also, e.g., Beale v. Blount,* 461 F.2d

1133, 1138 (5th Cir. 1972); *Brown v. Smith*, 828 F.2d 1493, 1494 (10th Cir. 1987) (per curiam); *Jachetta v. United States*, 653 F.3d 898, 908 (9th Cir. 2011).[8]

Nor do either 42 U.S.C. §§ 1983 or 1985 themselves waive the federal government's sovereign immunity. *Little*, 2022 WL 1302759, at *4 (citing, *inter alia*, *Engel v. MODOC*, No. 4:20-CV-1668 RWS, 2020 WL 76950411, at *6 (E.D. Mo. Dec. 28, 2020) ("[Section] 1983 does not waive the United States' sovereign immunity."); *Pflum v. United States*, No. 4:17-CV-579 DGK, 2017 WL 4771172, at *4 (W.D. Mo. Aug. 11, 2017) (Section 1985 does not waive sovereign immunity); *see also, e.g., Johnson-Bey v. United States*, No. 2:21-CV-6-NCC, 2021 WL 4191615, at *3 (E.D. Mo. Sept. 15, 2021) (White, J.) ("§ 1983 "provides for relief against state actors, not the United States of America.") (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)); *Unimex Inc. v. HUD*, 594 F.2d 1060, 1061 (5th Cir. 1979) ("[T]he United States has not consented to suit under the civil rights statutes."); *Jachetta*, 653 F.3d at 908 ("We find no evidence in either statute that Congress intended to subject federal agencies to § 1983 and § 1985 liability.").[9]

**2. <u>Federal-Officer Constitutional Tort Claims</u>**

Even if the Court were to construe Plaintiff's asserted §§ 1983 and 1985 claims as pled under the framework created by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), and its progeny, Plaintiffs claims would fare no better. In *Bivens*, the Supreme Court recognized a cause of action against federal officials acting in their personal capacity for violations of

[8] *See also*, *e.g.*, *Ajamu v. USPS*, No. 6:13-CV-450-ORL-28KRS, 2014 WL 169830, at *9 (M.D. Fla. Jan. 10, 2014); *La Casa de Buena Salud v. United States,* No. CIV 07-238 JB/RHS, 2008 WL 2323495, at *6 (D. N.M. Mar. 21, 2008); *Brian v. Gugin*, 853 F. Supp. 358, 363 (D. Idaho 1994); *Byrd v. Smith,* 693 F. Supp. 1199, 1201 (D.D.C. 1986); *Navy, Marshall & Gordon, PC v. U.S. Int'l Dev.–Coop. Agency,* 557 F.Supp. 484, 488 (D.D.C. 1983); *Melanson v. Rantoul*, 421 F. Supp. 492, 500 (D.R.I. 1976).

[9] Certain of Plaintiff's Section 1983 claims reference criminal law statutes. *See, e.g.*, FAC p. 45 (alleging a violation of 18 U.S.C. § 245); *id.* 48 (alleging a violation of 52 U.S.C. § 20511(2)(b)). These claims should additionally be dismissed because plaintiffs have no private right of action under criminal statutes. *See Radford v. United States*, 178 F. Supp. 3d 784, 790 (E.D. Mo. 2016) (dismissing claims premised on criminal statutes because "plaintiffs have no private right of action under these statutes"); *Lundt v. Hodges*, 627 F. Supp. 373, 375 (N.D. Iowa 1985); *Abou-Hussein v. Gates*, 657 F. Supp. 2d 77, 80 (D.D.C. 2009).

constitutionally protected rights. But the Supreme Court has "refused to extend *Bivens* to claims against federal agencies and private government contractors, as opposed to individual federal officials." *Sinclair v. Hawke*, 314 F.3d 934, 939-40 (8th Cir. 2003) (citing *FDIC v. Meyer*, 510 U.S. 471, 473 (1994), and *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63 (2001)); *see also Buford v. Runyon*, 160 F.3d 1199, 1203 (8th Cir. 1998) ("It is well-settled that a *Bivens* [or *Bivens*-type] action cannot be prosecuted against the United States and its agencies because of sovereign immunity.") (citing *Laswell v. Brown,* 683 F.2d 261, 268 (8th Cir. 1982)); *Little*, 2022 WL 1302759, at *4 (dismissing constitutional torts claims under Rule 12(b)(1), on the ground that "*Bivens* only applies to claims against federal agents, not agencies, and Plaintiff does not bring any claims against individuals"—and, thus, sovereign immunity applied); *Johnson-Bey*, 2021 WL 4191615, at *3 ("To the extent plaintiff can be understood to bring claims pursuant to *Bivens* … *Bivens* and its progeny do not waive sovereign immunity for actions against the United States."); *Cooper v. Feeney*, No. 2:22 CV 18 MTS, 2022 WL 2802303, at *4 (E.D. Mo. July 18, 2022) (similar).

**3. <u>The Declaratory Judgment Act</u>**

Nor does the Declaratory Judgment Act (DJA), also invoked by Plaintiff, provide a basis for federal question jurisdiction, because it does not constitute an independent cause of action. *Dakota, Minn. & E. R.R. Corp. v. Schieffer*, 711 F.3d 878, 881 (8th Cir. 2013); *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010); *Missouri ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*, 112 F.3d 1332, 1334 (8th Cir. 1997). A plaintiff seeking a declaratory judgment must assert an independent basis for federal jurisdiction, such as diversity jurisdiction or the enforcement of a federal right. *Schieffer*, 711 F.3d at 881. Once federal jurisdiction is established, the DJA may provide an additional remedy for the cause of action asserted. *Schilling v. Rogers*, 363 U.S. 666, 677 (1960). But without "the existence of a judicially remediable right," the DJA has no application. *Id.* Accordingly, because Plaintiff has not otherwise established jurisdiction to pursue any of her asserted claims against the Federal Defendants, the DJA cannot save her suit.

### 4. Alleged Deprivation of State Constitutional Rights

Finally, Plaintiff has similarly failed to identify any waiver of sovereign immunity that would apply to her Count IV, which alleges an unspecified "[d]eprivation of [c]onstitutional [r]ights" premised on certain articles of the Missouri Constitution. *See* FAC p. 47. As an initial matter, the nature of the claim that Plaintiff is trying to assert is unclear: citing a variety of state constitutional provisions, she alleges that she (and other unspecified—and unnamed—"Plaintiffs") "were harmed and continue to be irreparably harmed by" unspecified "unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications." *See id.*

In any event, the Court need not parse the precise nature of Plaintiff's claim because she has not identified any waiver of sovereign immunity that would allow her to bring this claim against Federal Defendants. Plaintiff cites 28 U.S.C. § 1331, which confers on district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" as the source of authority for her claim, but "§ 1331 does not, in and of itself, create substantive rights in suits brought against the United States," *Johnson-Bey*, 2021 WL 4191615, at *3 (quoting *Sabhari v. Reno*, 197 F.3d 938, 943 (8th Cir. 1999)). Thus, "if § 1331 is to be used to secure relief against the United States, it must be tied to some additional authority which waives the government's sovereign immunity." *Id.* (quoting *Sabhari*, 197 F.3d at 943). Plaintiff's failure to identify any waiver of sovereign immunity with respect to Federal Defendants in connection with Count IV necessarily dooms this claim. *See Radford v. United States*, 178 F. Supp. 3d 784, 788 (E.D. Mo. 2016) ("Where the federal government seeks dismissal for lack of subject-matter jurisdiction, the burden of showing both a waiver of sovereign immunity and a grant of jurisdiction falls on the plaintiffs"); *see also VS Ltd. P'ship v. HUD*, 235 F.3d 1109, 1112 (8th Cir. 2000) (same).

## IV. Plaintiff's Motion for Preliminary Injunction Should Be Denied

For the reasons stated above, Plaintiff's claims against the Federal Defendants should be dismissed, and her motion for preliminary injunction—to the extent it is understood to seek any relief related to the Federal Defendants[10]—should be denied as moot. But even if Plaintiff's case is allowed to proceed, her motion for preliminary injunction should still be denied because Plaintiff has failed to establish that such relief is necessary or appropriate. Plaintiff's motion does not even discuss the four factors that a court must consider before ruling on a motion for preliminary injunction, let alone demonstrate that these factors favor such an "extraordinary" form of relief. *Winter*, 555 U.S. at 24. Nor can she, because each of those factors counsels against injunctive relief in these circumstances.

### A. Plaintiff Has Not Shown a Probability of Success on the Merits of Her Claims

For a plaintiff to establish that she is likely to succeed on the merits of her claims, she must first establish that the court is likely to be able to reach the merits of her claims. In other words, she must demonstrate that the court has (or at least is likely to have) subject-matter jurisdiction over her claims. Without subject-matter jurisdiction, the court cannot rule in favor of the plaintiff.

For that reason, courts routinely assess whether subject-matter jurisdiction exists as part of evaluating the moving party's probability of success of the merits. *See, e.g.*, *Minn. Voters All. v. Walz*, 492 F. Supp. 3d 822, 828-35 (D. Minn. 2020) (assessing jurisdictional arguments as part of likelihood of success on the merits); *Johnson v. Krebs*, No. 4:18-cv-04108, 2018 WL 4696754, at *7 (D.S.D. Oct. 1, 2018) (same); *Iowa Right to Life Comm., Inc. v. Smithsonian*, 750 F. Supp. 2d 1020, 1029-36 (S.D. Iowa 2010) (same). And courts deny preliminary relief where subject-matter jurisdiction is lacking. *See, e.g.¸ K.B. Calloway Cty. Sch. Dist. Bd. of Edu.*, No. 5:21-cv-148 (TBR), 2022 WL 125929, at *3 (W.D. Ky. Jan. 12,

[10] As noted above, it does not appear that any of Plaintiff's requested relief—including the relief requested in her motion for preliminary injunction—runs against the Federal Defendants. *See* page 15, *supra*. However, because Plaintiff's motion does not distinguish between Federal and State Defendants, Federal Defendants assume, for purposes of this opposition, that Plaintiff intends to seek a preliminary injunction against Federal Defendants.

2022) ("The possibility that Plaintiffs lack standing is a strong indicator that their claim is not likely to succeed on the merits"); *Gabriel v. Weber*, No. 21-cv-05605, 2021 WL 3475714, at *2 (N.D. Cal. Aug. 6, 2021) ("Without Article III standing, Plaintiff cannot show likelihood of success on the merits, let alone irreparable harm."); *Small Sponsors Working Grp. v. Pompeo*, No. 1:19-cv-2600, 2020 WL 2561780, at *4 (W.D. Tenn. May 20, 2020) (citing *Munaf v. Geren*, 553 U.S. 674, 690 (2008)) ("The failure to show standing demonstrates that the plaintiff is unlikely to succeed on the merits.").

Because the Court should dismiss each of Plaintiff's claims (or at least those against the Federal Defendants) for lack of subject-matter jurisdiction, she has no probability of success on the merits of her claims and her motion for preliminary injunction should be denied.

### B. Plaintiff Will Not Be Irreparably Harmed in the Absence of a Preliminary Injunction

"Regardless of the strength of its claim[s] on the merits, a movant for a preliminary injunction should show a threat of irreparable harm." *See Gen Motors Corp.*, 563 F.3d at 318 (citing *Dataphase*, 640 F.2d at 113). To do so, a plaintiff must show "that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). The absence of such harm "is an independently sufficient ground upon which to deny a preliminary injunction." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

Plaintiff's motion for preliminary injunction asserts that Defendants have caused irreparable harm to her (and "all Missouri registered Voters") by "fail[ing] to protect [her] right to vote in a fair and equal election in the November 3rd, 2020, General election and subsequent elections," which Plaintiff contends "render[ed] any votes cast by Missouri registered voters . . . null and void." *See* PI Mot. 3, 11. As discussed above, these alleged harmed are the quintessential generalized grievance, and Plaintiff has failed to demonstrate how she will suffer any particularized harm absent a preliminary injunction. Thus, just as Plaintiff cannot establish standing based on this generalized grievance, she cannot establish

irreparable harm. *See, e.g.*, *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1330-31 (N.D. Ga. 2020), *aff'd*, 981 F.3d 1307. Further, Plaintiff's grievances related to past elections, including the November 2020 election, have no bearing on her motion for preliminary injunction because "'[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance.'" *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1015 n.3 (8th Cir. 2021) (quoting *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018)). Moreover, Plaintiff's asserted injury is not in any way imminent, nor could it be prevented by her requested relief. *See Taxpayers' Choice Volunteer Comm. v. Roseau Cty.*, 903 F. Supp. 1301, 1308 (D. Minn. 1995) (holding that when assessing irreparable harm in the context of a motion for preliminary injunction, "[t]he pertinent inquiry . . . is not whether the Plaintiff[] ha[s] been irreparably harmed, or even if [she] [is] continuing to be irreparably harmed," but rather "whether *the injunctive relief sought* is necessary *to prevent* irreparable harm").

Finally, "[i]t has long been recognized that delay in seeking relief vitiates much of the force of allegations of irreparable harm." *Independence-All. Party of Minn. v. Simon*, --- F. Supp. 3d ---, No. 22-cv-01231, 2022 WL 1537985, at *7 (D. Minn. May 16, 2022) (quoting *Hum. Rts. Def. Ctr. v. Sherburne Cnty.*, No. 20-cv-1817, 2020 WL 702840, at *6 (D. Minn. Nov. 30, 2020)); *see also Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) (collecting cases denying preliminary relief where plaintiffs delayed seeking it). Plaintiff purports to have been harmed by an election that occurred 21 months ago, yet she waited until July 14, 2022—less than three weeks before the August 2, 2022 primary—to seek a preliminary injunction. That substantial delay severely undermines any claim that she will be irreparably harmed absent preliminary relief.

Because Plaintiff has not identified any cognizable harm—let alone an irreparable harm that would be prevented through her requested relief—Plaintiff's motion must be denied.

### C. The Balance of the Equities and the Public Interest Do Not Support a Preliminary Injunction

Even if Plaintiff had shown a probability of success on the merits or irreparable harm—which she did not—the remaining *Dataphase* factors would strongly counsel against her requested preliminary injunction. Plaintiff's motion fails to address these factors, but, as this Court recognized, Plaintiff's motion for preliminary injunction asked the Court "to provide extraordinary and expedited relief that would potentially dismantle the election process in [Missouri] on the eve of an election." Order 3, ECF No. 27. Although the August 2, 2022 primary has now passed (and thus Plaintiff's requested relief is moot), the November 8, 2022 election is less than three months away. It is not in the public interest for the Court to issue an extra-ordinary order—reverting the entire state of Missouri back to hand-counted ballots—shortly before an election, particularly where Plaintiff has shown no likelihood that she will ultimately prevail in this litigation.[11] *See, e.g.*, *Walen v. Burgum*, No. 1:22-cv-31, 2022 WL 1688746, at *7 (D.N.D. May 26, 2022) (recognizing that "federal court orders impacting elections may themselves result in uncertainty and hardship for voters, candidates, and election officials"); *Independence-All. Party of Minn.*, 2022 WL 1537985, at *8 (discussing the "interest in having election rules settled in the run-up to the election"); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944-45 (2018) (per curiam) (holding that "a due regard for the public interest in orderly elections supported the District Court's discretionary decision to deny a preliminary injunction").

## CONCLUSION

For the above-stated reasons, the Court should dismiss this action in its entirety as to the Federal Defendants, and deny Plaintiff's Motion for a Preliminary Injunction.

[11] Plaintiff's motion does not seek to overturn the results of the now-past August 2, 2022 primary; however, such relief would also be inappropriate and contrary to the public interest. *See, e.g.*, *Wood*, 501 F. Supp. 3d at 1331 (finding that the balance of the equities and the public interest weigh heavily against a preliminary injunction because "[t]o interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways"); *see also King*, 505 F. Supp. 3d at 739.

Dated: August 12, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

/s/ *Antonia Konkoly*
Antonia Konkoly
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
(202) 514-2395 (direct)
(202) 616-8470
antonia.konkoly@usdoj.gov
NY Bar. Registration No. 5011895NY

*Counsel for the Federal Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 12, 2022, I electronically filed the foregoing using the CM/ECF system, and I hereby certify that I have mailed a copy of the foregoing to Petitioner, a non CM/ECF participant in this action, via the U.S. mail as follows:

Alison Graeff
519 N. 6th Street
St. Charles, MO 63301
*Pro se Plaintiff*

/s/
Antonia Konkoly
*Counsel for the Federal Defendants*